TAMATHA SNETHEN,

Plaintiff,

v.                    406CV259

THE BOARD OF PUBLIC EDUCATION FOR THE
CITY OF SAVANNAH AND THE COUNTY OF
CHATHAM,

Defendants.

# ORDER

## I. BACKGROUND

This case arises from an 11/15/03 attack on Tamatha Caprice Snethen by a fellow student at Jenkins High School in Savannah, Georgia. Snethen sues The Board of Public Education for the City of Savannah and the County of Chatham (hereafter for convenience, the "Board"), alleging a violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681-88.[1] Doc. # 47.[2] Boiled down, she complains that the school failed to protect her from sexual and other harassment. *Id.* ¶¶ 24-32. It also, she asserts, maintained a hostile learning environment and retaliated against her after she complained of an attempted rape against her. Doc. # 47 ¶¶ 33-47, 49, 117. The Board moves the Court for summary judgment and to exclude evidence. Doc. ## 101, 93. Opposing, doc. # 117, Snethen also moves to strike portions of the Board's summary judgment affidavits. Doc. # 163.

## II. ANALYSIS[3]

### A. Title IX -- General Standards

"[S]tudents must not be denied access to educational benefits and opportunities on the basis of gender," *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999), which is why Title IX proscribes gender discrimination. *Id.* "[S]exual harassment is a form of discrimination for Title IX purposes...." *Id.* at 649-50. Student-on-student, or "[p]eer sexual harassment[,] is a type of sexual discrimination which creates a hostile environment." LENTZ SCHOOL SECURITY § 6:11 *Sexual harassment; Title IX* (Dec. 2007). Harassed students can invoke Title IX to seek redress from Title IX-funded school districts that fail to prevent peer sexual harassment. *Id.* A student-plaintiff

> must prove four elements. First, the defendant must be a Title IX funding recipient. Second, an "appropriate person" must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred. An "appropriate person" is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Third, a funding recipient is liable for student-on-student harassment only if the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities.... Fourth, the discrimination must be so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.

---

[1] Title IX provides, that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

[2] She also pursued members of the Board in their individual capacities, alleging violations of Georgia law, doc. # 47, but has since dropped her case against them, doc. # 96, so the caption of this case has been amended and all subsequent filings shall so conform. For that matter, the Court agrees with the Board (doc. # 162 at 1; # 182 at 1) that plaintiff's state law claims are no longer in this case, only her Title IX claims against the Board.

[3] This Court will apply the summary judgment standards recounted in *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).

*Williams v. Bd. of Regents of Univ. Sys of Ga*, 477 F.3d 1282, 1293 (11th Cir. 2007) (quotes, cites and alterations omitted); *see also Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008). Here there is no dispute that the Board is a Title IX funding recipient. The parties do dispute, however, the remaining elements of proof.

**B. Peer Sexual Harassment**

An encyclopedist proffers examples of peer sexual harassment:

> Unwelcome sexual comments and advances, requests or demands for sexual favors or dates, bullying, graffiti, sexual rumors, intimidation, name calling, sexual jokes, cartoons, pictures, pornography, pressure for sexual activity, sexual conversation, sexual assault, blocking, and hand and/or body gestures are all examples of peer sexual harassment.

LENTZ SCHOOL SECURITY § 6:11. In contrast,

> [s]exual harassment does not include non-sexual contact, such as contact occurring during sports or flirting. Flirting is not intimidating, manipulating, or insulting. It does not make the person feel uncomfortable, helpless, or degraded. When peer sexual harassment is severe, persistent, or pervasive so as to limit a student's ability to participate in the educational program as to benefit from it, a hostile educational environment exists. Gender-based, non-sexual harassment such as physical aggression, intimidation, or hostility is unlawful discrimination if it is pervasive or openly practiced.

*Id.* (footnote omitted).

Courts decide whether there is enough harassment evidence to justify taking the case to a jury. "Damages," for example, "are not available for simple acts of teasing and mere name-calling among school children[,] even where these comments target differences in gender." *Hawkins v. Sarasota County School Bd.*, 322 F.3d 1279, 1288 (11th Cir. 2003). And the "real world of school discipline is a rough-and-tumble place where students practice newly learned vulgarities, erupt with anger, tease and embarrass each other, share offensive notes, flirt, push and shove in the halls, grab and offend." *Id.* (quotes and cite omitted).

The *Hawkins* court drew the evidentiary-sufficiency line in that case. *Id.* at 1278-79 (second grade boy's alleged persistent making of sexually explicit and vulgar remarks to, and objectively offensive touching of, three girls in his class was not severe enough to have a systemic effect of denying the girls equal access to an educational program or activity as required to support a Title IX claim against the school district, where, although the harassment was unwelcome and intimidating, and two of the girls said they faked being sick several times in order not to go to school, none of the girls told their parents until months after the alleged harassment began, none suffered a decline in grades, none of their teachers observed any change in their demeanor or classroom participation, and there was no physical exclusion or denial of access to facilities).

**C. Title IX -- Relevant Time Periods**

Title IX liability can flow from two "harassment" time periods: (a) when a school exhibits deliberate indifference, *before* a harassing attack on a student by a fellow student, in a way that makes the student more vulnerable to the attack itself; or (b) when a school exhibits deliberate indifference, *after* an attack, that causes a student to endure additional harassment. *Ross v. Corporation of Mercer University*, 506 F.Supp.2d 1325, 1346 (M.D.Ga.

2

2007); *see also* Ann., 141 A.L.R.FED. 407.

### D. Title IX -- Notice

Many cases turn on whether a school had notice of the complained-of harassment. *See Rost*, 511 F.3d at 1119-20 (learning-disabled student's statement to school counselor that boys were bothering her did not provide school district with actual knowledge that student was being sexually harassed, and district thus was not liable under Title IX, even if student did not know how to use word "assault" to describe being coerced into performing oral sex, and notwithstanding parent's pleas to counselor to find out what was bothering student); *Dale v. White County, Georgia School Dist.*, 238 Fed.Appx. 481, 483-84 (11th Cir. 2007) (school district was not liable to parents for violating daughters' rights under Title IX for discrimination based on sex arising out of teacher's alleged sexual harassment of daughters, where supervisory official with authority to take corrective action on behalf of school district did not have actual notice that teacher was molesting students); *Bailey v. Orange County School Bd.*, 222 Fed.Appx. 932, 933 (11th Cir. 2007).

In *Hawkins,* the Eleventh Circuit's first peer-harassment case, 322 F.3d at 1280, the court declined to decide "whether notice to a teacher constitutes actual knowledge on the part of a school board," *id.* at 1286, since it could dispose of the case on other grounds. *Id.* at 1287-88. In this circuit, then, the notice issue (*i.e.*, whether notice to a particular teacher, for example, is legally sufficient to affix liability against a school district), remains an open legal question.[4]

---

[4] As another court recently summarized:

> In cases of peer sexual harassment, it remains an "open" question as to whether knowledge of the discrimination by a classroom instructor constitutes knowledge by the funding

### E. Title IX -- Deliberate Indifference

A school district's negligent failure to prevent peer harassment supports no Title IX liability. Deliberate indifference must be shown, and that doesn't occur simply because preventive measures taken are ultimately ineffective. *Sauls v. Pierce County Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir. 2005). Such indifference occurs "only where the [school district's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 647-48; *Doe v. Autauga County Bd. of Educ.*, 2007 WL 3287347 at * 6 (M.D.Ala. 11/5/07) (unpublished); *see also* CJS CIVIL RIGHTS § 171 (*Student-on-student harassment*) (2008) ("A school district is not deliberately indifferent, for purposes of Title IX, because, after the district takes reasonable actions to address peer sexual harassment, additional harassment occurs under new and different circumstances").

In that regard, a school's imperfect responses to harassment will not support Title IX liability. *See, e.g., Fitzgerald v. Barnstable School*

---

> recipient. *Hawkins,* 322 F.3d at 1286. In such cases, however, knowledge by an assistant principal, *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F.Supp.2d 942 (S.D.Ind.2007), a Title IX coordinator, [*Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 253 (6th Cir. 2000)], an affirmative action officer or a dean, *Morse v. Regents of Univ. of Colo.*, 154 F.3d 1124 (10th Cir.1998), and a university lawyer ("an official responsible for fielding sexual harassment complaints"), [Jennings v. University of North Carolina, 482 F.3d 686, 700 (4th Cir. 2007)], all have been deemed sufficient.

*S.S. v. Alexander*, 177 P.3d 724, 737-38 (Wash.App. Div. 1 2008); *see also Addison v. Clarke County Bd. of Educ.*, 2007 WL 2226053 at * 3 n. 6 (M.D.Ga. 8/2/07) (unpublished).

3

*Committee*, 504 F.3d 165, 173 (1st Cir. 2007) (elementary school superintendent and school committee reasonably responded in light of known circumstances to alleged peer sexual harassment, and thus, school did not act with deliberate indifference in violation of Title IX; school reacted promptly to complaint and each time parents notified of new developments, commenced full-scale investigation which it pursued diligently, if imperfectly, offered suitable remedial measures, and reasonably refused to discipline alleged harasser given school's inability to corroborate harassment allegations and police's termination of investigation with no recommendation for further action). Again, the response must be shown to be clearly unreasonable. *Id.* While "an institutional response to harassment may be carried out so inartfully as to render it clearly unreasonable," *id.* at 175, "courts have no roving writ to second-guess an educational institution's choices from within a universe of plausible investigative procedures." *Id.*

As is the case with whether a student-peer's conduct amounts to sexual harassment, courts also police the borderline on what constitutes sufficient "deliberate-indifference" evidence to take the case to a jury. *See, e.g., Doe* 2007 WL 3287347 at * 6 ("The court finds that, despite the school district's self-serving characterization of Wright as just an ineffective teacher who used friendship to manage his class, an appropriate person with the School Board received actual knowledge that Wright's presence in the school system at the very least posed a significant risk of sexual abuse to students").

### F. The Attack

In that the Board has moved for summary judgment, the Court views the evidence with all reasonable inferences in Snethen's favor. But inferences "supported by only speculation or conjecture will not defeat a summary judgment motion." *Fischer v. Avanade, Inc.*, ___ F.3d ___, 2008 WL 681173 at * 6 (7th Cir. 3/14/08) (quotes, alterations and cite omitted); *Brown v. Fortner*, ___ F.3d ___, 2008 WL 564705 at * 3 (8th Cir. 3/4/08) ("As with any summary judgment motion, while we are required to make all reasonable inferences in favor of the non-moving party, we do not resort to speculation").

So viewed, the evidence reveals that on 11/15/03, during "Saturday School" at Jenkins, student Avon Sams sexually assaulted Snethen, and a security camera recorded it. Doc. # 104, exh. B at 107-08, 112; # 113 at 101. Snethen, who by that point had attended the 1600-student school for only about 3.5 months, doc. # 84 at 90; # 157 at 75, had left a school work room and headed toward its right wing to "sign in" for the day when she encountered Sams:

> I was going toward [a teacher's] office and then Avon stopped me in the hallway, asked me where I was going, and then he asked if he could walk with me and I was, like sure. And then we went down the Biology wing and then he threw me against the wall and then all that [*i.e.*, the sexual assault]⁵ happened, and then I went

---

⁵ The Chatham Board of Education Police Department's 11/15/03 report states in pertinent part:

> [Sams] approached her and asked her if she had a boyfriend, which she told him yeah and then they were talking. So [Sams] continued walking with her, which she said okay, for him to walk. [Sams] then got closer to [Snethens] and asked if that was OK and she said no and then at that point [Sams] pushed her into the wall and grabbed her legs and put her in a corner. She tried kicking and swinging her arms and then he forced her down on the ground while in the process of taking her pants off. He pinned her down and got on top of the victim and ask[ed] her do you feel my dick. She told him to get

4

to, toward the cafeteria cause I was right by this door, and I was closer to this door than I was to this door, I believe, and I walked out and seen Destry [Syms], a boy I knew over from lunch or whatever ... and I told him about it and then we found Mr. T, which is what they called him, Thompson, he was the officer, security person in charge, went to him and I was directed back to class. [¶] I don't remember what I said to him [Thompson]. I don't remember if I told him. I know I told Destry.

Doc. # 113 at 107-08 (footnote added); *see also id.* at 112.

The attack stopped short of an actual rape. *Id.* at 117 ("Q. Now, in regard to this incident involving Mr. Sams, you obviously resisted his physical advances towards you; is that correct? A. That's correct. Q. And you were able to prevent him from removing fully your clothing; is that correct? A. Yes. That's correct. Q. And you were able to prevent him from actually raping you; is that correct? A. That's correct"); *id.* at 171 (she did not see a medical doctor after the incident).

### G. The Aftermath

The security officer either directed or escorted Snethen back to her class. Doc. # 113 at 120. She remained there for the rest of its session, perhaps around 11:30 to 12 noon. *Id.* at 120-21.

---

the f__k off. He then had her pants down a little below her bottom, at which time she was able to get away from him by pushing him off. She walked to the front of the school and found a friend and told him what happened and they walked and found Mr. Thompson and they all walked back to class.

Doc. # 81 exh. P-2; *see also id.* exh. P-7. Sams's confession generally comports with Snethen's recollection. Doc. # 81 exh. P-3; *see also* doc. # 83 at 79-81.

Plaintiff does not recall telling any teachers about the incident. *Id.* at 121.[6] After school let out, she went to a friend's house, then out with friends to eat at a local restaurant. *Id.* at 122-27.

Later, Snethen went to Katie Hamilton's house, where she waited until her grandmother[7] arrived, then related the incident to Hamilton. *Id.* at 131-33. Hamilton, herself a local police officer, made a police report about the incident. *Id.* at 131. Snethen returned to her home with her grandmother, who with her mother called the police. Doc. # 157 at 55; # 112 at 84. The police arrived shortly thereafter, as did a school security officer. Doc. # 113 at 133-37; # 157 at 57-58. Snethen spoke with approximately three to four police officers. Doc. # 113 at 136-37. She then wrote out a written statement recounting the attack. *Id.* at 142-43.

Snethen's mother and sister, along with her grandmother's husband, accompanied her to school the following Monday morning. Doc. # 113 at 138-39; # 157 at 56, 59. They spoke with principal Freddie Gilyard[8] about the incident, as well as school safety officers Kent and Thompson. *Id.* at 140. Snethen gave her written statement to the school and, along with school officials, watched a security videotape of Sam's assault against her. Doc. # 113 at 141-43, 181; # 112 at 89.

The school generated an incident report that

---

[6] The teacher to whom Snethen returned to that day (accompanied by Thompson) reports that "there was no obvious signs of distress or disarray on [Snethen's] part." Doc. # 81 exh. P-12.

[7] Snethen's grandmother, Brenda Edwards, has been Snethen's legal guardian since 1999. Doc. # 157 at 70.

[8] Gilyard is a female, and her last name is spelled, depending on the court reporter, "Gilyard," doc. # 84 at 7, or "Guillard," doc. # 147 at 4, or "Gilliard." Doc. # 83 at 83. The Court will arbitrarily select and use "Gilyard."

day, doc. # 113 at 148; doc. # 81 exh. P-1, then immediately suspended Sams, requested his expulsion, and referred him for criminal prosecution. Doc. # 81, exh. P-16, P-17, P-30, P-48, P-49; # 112 at 135-36; # 113 at 147-48.[9] There is no dispute that the school had in place a Code of Conduct, which Snethen herself signed, expressly prohibiting "Harassment and Bullying," including sexual harassment, assault, battery and threats. Doc. # 113 at 149-155; # 157 at 61; # 81 exh. P-46, BOE-0308; P-47, BOE-0310; # 84 at 94. Nor is there any dispute that the school applied it to Sams in opting for his suspension, expulsion, and prosecution.

Snethen thereafter missed many school days. Doc. # 113 at 156. Some of the absences were due to, she claims, pneumonia. *Id.* She also was out "ten plus days" because she felt "uncomfortable." *Id.* at 157-58; *id.* at 158 ("A. I figured it was the situation I was in of just having to go to the school after the incident. I just felt unsecure or unsafe and just, I guess, the comments that were being made, made me feel unsafe and I just didn't want to be there anymore. I wanted to quit").

When she returned to Jenkins after the assault, "people [in the hallways] would make remarks, oh, there that girl is, you know, she's the one, da, da, da, basically pointing fingers, making little comments about what happened. I was in class and comments were being made. [¶] And [when] my mother ... went to [withdraw me from Jenkins], comments were being made in front of her and the teacher, just little stuff like that...."

---

[9] Snethen's mother deposes that the Board never contacted her about the incident and that when she and her daughter and kin met with principal Gilyard that following Monday it was she (Brenda Snethen), and not the school, who brought up the videotape's existence. Doc. # 112 at 128-29. Brenda feels that Gilyard was biased. *Id.* at 130 ("By her face expressions and the way she was acting, in my opinion, no, not until she had evidence [did she believe Tamatha's story]. She was bias[ed]").

*Id.* at 157.

In fact, there were not "a lot of [comments] made directly to [Snethen], they were just made around [her] so that [she] could hear them, but when [she and her mother went to Jenkins to withdraw her from that school], that's the main one [*i.e.*, episode of encountering negative comments from others] is when I went up to the school." *Id.* at 158; *see also id.* at 166 ("We were going to withdraw, went to the classroom and some students were pointing, saying I am the one who got him locked up, and then they started saying, calling me a name calling me out [by] my name, and they were making other comments. And my mother told me to step back, and the teacher asked if he could help us. And my mother said, yes. Teacher walked over, him and my mother were talking, and then my mom grabbed my arm to turn me around and told us we were leaving").[10]

Also, plaintiff remembers "going to class one day and a group of people were standing around the locker and they started pointing at me, making comments about I am the one, about there's that girl or whatever and talking about me snitching and doing something, saying

---

[10] Snethen elaborated:

> I remember being called out of my name, like calling me a "whore" or "bitch." I remember them pointing, saying, I am the one that got him locked up. I heard someone say something about slicing my face, but I don't know who said that. That was like further over to the right, cause they were all sitting on the left in the back. I think that's it.

Doc. # 113 at 166. This incident occurred when Snethen was in the process of completing paperwork to withdraw from attending Jenkins high school. *Id.* at 167. Brenda Snethen, her mother, remembers comments like "That's the white girl that's putting another brother in jail," doc. # 112 at 123, and "[s]he's a slut." *Id.*

6

something." *Id.* at 163.

There is no competent evidence in the record showing that Snethen complained about any of these comments and the school deliberately disregarded any duty to address them. Nor has Snethen shown what the school reasonably could have done to muzzle nasty comments from Sams-sympathizing students, as demented as they were.

In addition to the above comments, one teacher, sometime after the attack, discussed the attack generically -- in front of Snethen -- to Snethen's class:

> She made a comment stating an incident happened in the hallway and that it shouldn't have happened, that that person shouldn't be there and that I was in the wrong place at the wrong time. She didn't say my name, but she stated the comment and she knew that I knew what she was talking about.

Doc. # 113 at 160. This upset Snethen, "[t]he way it was directed at me, like every time she would say something about it, like when she was speaking about it, she kept directing, like making eye contact with me, like she was referring it to me, that I know what she was talking about...." *Id.* at 161. It made her feel like Sams's assault was her fault. *Id.* at 176. Plaintiff complained to her mother and grandmother about it. *Id.* at 164. Principal Gilyard spoke to her mother about it. *Id.* at 165. Snethen complains of no similar "public" comments from any teacher thereafter.

Snethen ultimately transferred to Windsor High School (also in Savannah), doc. # 113 at 169, but she was "uncomfortable being there," *id.* at 170, though there were no individuals or groups in particular who made her feel that way. *Id.*; *see also* doc. # 157 at 64. Nor did she complain to anyone of her discomfort. Doc. # 113 at 170-71. She did receive, however, counseling, and she later saw a psychologist. *Id.* at 171-73.

Plaintiff was disciplined for some disciplinary infractions of her own, *id.* at 182-83, and ultimately failed out of the ninth grade after missing too many school days. *Id.* at 179 (she was disenrolled from Windsor "because I had missed so many days, I believe"). She wound up at the school system's "Corporate Academy." *Id.* at 177; doc. # 157 at 65. There, according to Snethen's mother, a student made a threat against her, doc. # 157 at 123, but was promptly disciplined and subsequently expelled "for drugs." Doc. # 112 at 123-24. Otherwise, according to her grandmother, Snethen and her family were "very happy with that" school. Doc. # 157 at 65. In fact her mother, deposed on 4/27/07, expected Tamatha to graduate as "an A student" on 5/29/07. Doc. # 112 at 126.

### H. The Board's Summary Judgment Motion

#### 1. Pre-Assault Time Period

The Board insists that it had no notice of Sams's sexually violent behavior or propensity. Doc. # 162 at 5-9; # 182 at 1-7. In that notice is an indispensable element to a pre-attack, harassment claim, *see supra* Part II(D), the Board seeks summary judgment on that basis alone. Doc. # 103 at 12-16. Alternatively, it argues that it cannot be shown to have been deliberately indifferent toward Sams's assault. *Id.* at 16-22. Its handling of the entire matter, it contends, at worst was imperfect and thus not legally actionable. *Id.*

As for notice, it is true that Sams had a disciplinary record, but so does a multitude of other students across the nation. None of the cited incidents individually or in combination rise to the level necessary to put the Board on notice that a sexual predator was on the loose, certainly not to the extent that the Board could

7

be said to have been deliberately indifferent to the *sexual-assault* threat Sams posed (Snethen alleges no contact from, much less harassment by, Sams prior to 11/15/03). *See Hawkins,* 322 F.3d at 1288 (the "real world of school discipline is a rough-and-tumble place where students practice newly learned vulgarities, erupt with anger, tease and embarrass each other, share offensive notes, flirt, push and shove in the halls, grab and offend") (quotes and cite omitted).

The principal testimony on which plaintiff relies, that of former Jenkins teacher John R. Teater, doc. # 83, combined with a close review of Sams's disciplinary reports, P. exh. ## 31-45, simply does not support the characterizations made in plaintiff's brief (doc. # 117 at 3-5) regarding the nature and implications of Sams's pre-attack conduct. At most the evidence enables a factual determination, including any reasonable inferences in plaintiff's favor, that Sams was disruptive in Teater's class and horsed around with both male and female students, including a physically large black girl who "horsed" back. *See, e.g.*, doc. # 83 (Teater dep.) at 34 ("Q. Did he ever call this girl a bitch? A. Yeah. I believe I have heard that before. Q. Did he ever call her a whore or a hoa?. A. Hoa. I heard the hoa terminology from him, yeah. Q. Any other language with a sexual connotation that you can recall? A. Just usually just put downs, kind fo put down stuff. I mean, yeah. Bitch, hoa. That was something pretty normal. That was kind of common, yeah, at that time. Nor really -- I can't think of anything else beyond that probably"); *id.* at 88 ("Q. Do you know of any other incidents of sexual harassment or sexual assault that occurred at Jenkins High School that year [*i.e.*, 2003-2004]?" A. I don't know of any sexual assault personally myself. I don't have any knowledge of any. Harassment, I mean, kids, like I said, I am telling you, the last 10 years, they harass each other a lot. It is -- from the outsider coming in probably would say, yeah, that's sexual harassment. To them, they are just messing with each other. You never know. It is hard to tell. It is -- really is, unless it gets really direct where somebody is really confronting somebody. I didn't see anybody like pin anybody against the wall. I didn't see anybody threaten anybody. I didn't see that. I didn't see that happening. Just by and by comments to each other. Kind of as they walk past each other saying stuff, typical type stuff"); *see also id.* at 90 (Sams would comment on the large girl's breast size, she would retort about his penis size, and Teater would immediately address it by telling them to "[s]top janking on each other here"); *id.* at 90-91 (Teater told Sams to "keep your hands to yourself" because "[t]he big girl he messed with all the time, they would poke each other back and forth. *They would do a lot of touching*, just kind of poking *each other*, that kind of stuff. That's what I was talking about. Keep your hand to yourself. Don't be touching anybody. Keep your hands off each other. If you let kids do too much of that, that ends up getting into something else"); *id.* at 96 ("He was a defiant little booger")[11]; *id.* at 105-06 (Q. "Did the girls complain about [Sams's] touching? A. To him they would say, don't touch my arm. Get off me. Stuff like that. They would *set each other up and do that.* They [the female students] would *mess with him* and he would touch back. Kids do that.... Q. Did [the female students in Teater's class] complain that [Sams] was touching them inappropriately? ... A. I think the big girl ... She did complain he touched my breast. Well, I think he had reached over and had tried to poke her or something, yeah. Said something to him about that. That's when I wrote him up on that, too. Keep your hands to yourself. Sometimes I would see *her* smack *him* on the back coming down the hallway") (emphasis added); *id.* at 112 ("But kids today, I see *girls* smack *guys* on the

---

[11] That defiance climaxed in an 11/12/03, Teater-Sams confrontation, *not* shown to have involved sexual misconduct, that resulted in Sams's removal from the classroom. Doc. # 83 at 67-72.

8

*butt*. It is different [today than in the past]. It [deciding what constitutes sexual harassment and writing a student up for it] has gotten different. It is a fine line").[12]

Even according a liberal inference to Snethen here, and assuming that the Sams-misbehavior information is imputable to school management, no rational jury could conclude that this sufficed to place the school on *actual* notice[13] that Sams was a violent sexual predator, much less a sexual harasser. Note that Teater, upon viewing the videotape of the attack, remarked "wow, that is pretty bizarre," doc. # 83 at 75, and "I can't believe [Sams] did that in the halls with the cameras on and stuff." *Id.* at 76. Teater's reaction was *not* "Oh, we all knew *that* was coming," or other words consistent with foreknowledge sufficient enough to spur him to have warned school management, ahead of the attack, that Sams posed a sexual harassment and/or violent sexual assault threat to female students. *See also id.* at 139 ("Q. Mr. Teater, from your -- from teaching Avon Sams before the [11/15/03] incident ... did you have any idea that he would do something like the assault he did on [11/15]? A. No. I don't think you can ever tell that anybody is going to do that").

For that matter, even if *teacher* Teater could be characterized (*see* O.C.G.A. § 20-2-738 (delineating teacher/principal disciplinary roles)) as an "appropriate person" under Title IX, *see Warren ex rel. Good v. Reading School Dist.*, 278 F.3d 163, 171 (3d Cir. 2002) (school *principal* who was in charge of daily operations of elementary school, including supervision and discipline of teachers, and health, safety, and welfare of students, and had authority to initiate corrective measures in cases of teacher misconduct, was "appropriate person" whose knowledge of teacher's sexual abuse of fourth-grade student, and failure to respond adequately thereto, could have subjected school district to liability for monetary damages for abuse under Title IX), and even if that can be used to tag the Board with Title IX liability knowledge-wise (*i.e.*, that Teater was, as a matter of law, an "appropriate person" under the above-explained, Title IX criteria), a complete review of Teater's entire deposition reveals evidence authorizing a jury to at most find that he was negligent, not deliberately indifferent, in the way he perceived, wrote up and disciplined Sams's misconduct.

In any event, Teater cannot be said to have been an "appropriate person," given the higher courts' concern about notice and thus Title IX liability becoming too fluid for the strict contractual nature (schools are said to contractually agree to be liable in exchange for Title IX funding) of such claims. And those who could be said to have been an "appropriate person" (Jenkins's principal and vice-principal) attest that they had, prior to the attack, received

---

[12] Teater later conceded, after plaintiff's counsel repeatedly asked him about his "write-up" on the breast-touching incident, that he "probably should have been more clear" about it in his write-up on Sams that day, doc. # 83 at 143-44. However, that only reinforces the Board's argument that at most *Teater's negligence* factored into the notice and response process here, not the *Board's* deliberate indifference (recall that there is no respondeat superior, imputed-knowledge based liability in Title IX cases).

[13] As explained in Part II(D) *supra*, an institution can be held liable for a Title IX violation only if "an official who ... has authority to address the alleged discrimination and to institute corrective measures ... has *actual* knowledge of discrimination in the [institution's] programs and fails adequately to respond" or displays "deliberate indifference" to discrimination. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (emphasis added). The *Gebser* Court held that it would frustrate the purposes of Title IX to permit a damage recovery against a school district for a teacher's sexual harassment based upon principles of respondeat superior or constructive notice. 524 U.S. at 285. "In short, *Gebser* rejects liability under Title IX based upon what a school district 'should have known.' 524 U.S. at 283." *Peer ex rel. Doe v. Porterfield*, 2006 WL 3898263 at * 5 (W.D.Mich. 1/8/06) (unpublished).

9

no such "sexual harassment" conduct notice. Doc. # 104 exh. K & L.

Finally, even if there was sufficient notice to the school (*i.e.*, enough to warrant the school's Title IX-level response to Sams's pre-attack misconduct), at most the district was negligent in failing to recognize that Sams could erupt into sexually assaultive behavior. There is simply no pattern evidence of "sexually touching" female students. Boiled down, Snethen essentially points to *one* breast-touching incident which undisputably occurred during horseplay with a female who touched Sams back and may have even smacked him on his butt. The Court has otherwise been shown no repetitive *sexual* or other violent conduct, much less a pattern, by which the school could be said to have been placed on notice that it had a sexual predator on its hands. No reasonable teacher or administrator could be charged with deliberate indifference for failing to anticipate that Sams would progress from the above-described, "bitch-and-ho" horsing around behavior to a sudden, daylight sexual-attack in a *public* school hallway. *See Hawkins,* 322 F.3d at 1288 (the "real world of school discipline is a rough-and-tumble place where students practice newly learned vulgarities, erupt with anger, tease and embarrass each other, share offensive notes, flirt, push and shove in the halls, grab and offend") (quotes and cite omitted).

In that regard, it was not unreasonable, much less deliberately indifferent, of Teater to have been coarsened and emotionally "novocained" by the self-debasing culture surrounding him[14]

---

[14] *Cf. Breda v. Wolf Camera, Inc.*, 148 F.Supp.2d 1371, 1375 (S.D.Ga. 2001) ("The question [in Title VII cases] of what is 'sufficiently severe' sexual harassment is complicated because ... the modern notion of acceptable behavior -- as corroded by instant-gratification driven, cultural influences (*e.g.* lewd music, videos, and computer games, "perversity-programming" broadcast standards, White House "internal affairs" and perjurious coverups of

(Jenkins was an overcrowded, urban public school at the time) when he made disciplinary judgment calls (*e.g.*, whether Sams accidently poked during horseplay, as opposed to deliberately fondled, the large black girl's breast, and whether *that* was *sexual*, as opposed to *horseplay,* "harassment," and whether, in turn, Teater should have written that up as so, report it up the line, etc.) that are now sought to be hindsight-judged as deficient by others.

## 2. Post-Assault Time Period

The Court comprehensively set forth the post-attack facts in Part II(G), *supra*. Viewed with all reasonable inferences (from *evidence*, not assumption and speculation) in Snethen's favor, plaintiff's evidence fails to cross the borderline between summary and jury disposition of her case. Once again, plaintiff's spin on these facts is not supported by the record evidence.[15] At worst the evidence supports a "negligence" inference here, not a deliberate indifference, much less intentional conduct which fomented a hostile environment.[16] Even at that, what Snethen was

---

same, etc.) -- has been coarsening over time....").

[15] The Court generally agrees with and thus grants much of the Board's motion (doc. # 163) to strike the Snethen affidavit testimony as conclusory, based on hearsay evidence not reducible to admissible evidence at trial, speculative, or otherwise incompetent on its face. *See, e.g.*, doc. # 163 at 5-6 (recounting Tamatha's attestations that "it was obvious Officer Kent did not believe me either" -- plaintiff is not competent to relate what someone else was thinking). In that regard, earlier in this opinion the Court reproduced and relied upon otherwise incompetent Snethen testimony solely to provide comprehension-assisting background context.

[16] Snethen makes much of the school's seemingly lackadaisical attitude about retrieving the security videotape that captures Sams's attack. *See* doc. # 178 at 12-15 (suggesting that if Snethen hadn't known about it and thus pushed the school to retrieve it, the school would have let the tape loop run its course and thus tape over the

10

left to face (the ambient nasty comments and discomforting "lecture" by an unfeeling teacher) cannot be said to meet the *Davis* standard. *See Davis*, 526 U.S. at 650 (holding that "in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect."), *quoted in Young v. Pleasant Valley School Dist.*, 2008 WL 417739 at * 7 (M.D.Pa. 2/13/08) (unpublished). And there is *no* factual or legal basis for her retaliation claim; at most she places a nefarious spin on normal disciplinary measures, and at worst "imperfect" responses to her situation. This is, after all, a *public* (not a perfect) school system.

The Board is therefore entitled to summary judgment on the hostile environment and retaliation issues, too. That means that the plaintiff's case must be dismissed. And that, in turn, moots the Board's motion (doc. # 93) to exclude plaintiff's mental-health related evidence.

This result, while compelled by Title IX's deferential standards, is displeasing to say the least. As disclosed by the depositions, affidavits and evidence in this case, the Court is appalled at the decline of manners and conduct in the public school system. Moreover, the toleration of vulgarity and coarseness by our culture can only portend further decline. The many cases reviewed here demonstrate that the various school systems, including this one, seem to breed more than interdict such conduct. It's as if "Animal House" has become the template for pedagogic settings, with morality and respect for others dismissed as quaint notions.

It is true that the schools, teachers, security personnel and administrators have but minimal influence on the household manners that produce these students. But they cannot absolve themselves of responsibility by citing fear of lawsuits over cracking the proverbial disciplinary whip. It is simply unacceptable to accept the degradation that various witnesses now claim as the norm. Here and across the nation, the schools' failure to retrain students' animal instincts constitutes a betrayal of pedagogic responsibility. There will always be excuses, but strong leadership and rule enforcement, while not pleasant, will make a difference. Meaningful remedies, including consideration of separating the sexes at all middle and high school levels, must be explored, because the current system is unacceptably flawed. The defendants in this case are shielded by law, but they should not construe this result as approbation of the manner in which they operated their school system here.

---

evidence, then adopt an "if it's not on tape it didn't happen" attitude). The problem with this reasoning (plaintiff contends that it is thus a jury question whether that "attitude" would have subjected or made her vulnerable to further attack by Sams or other predators) is that it proceeds on speculation (there is no *evidence* that school officials held that attitude, and their *conduct* -- immediately suspending, then seeking expulsion and prosecution of Sams -- renders this evidence insufficient to carry this into the jury-issue zone). And speculation, of course, has no place in Rule 56 determinations.

## III. CONCLUSION

Plaintiff Tamatha Snethen's Request for oral argument (doc. # 123) is ***DENIED***. The motions of The Board of Public Education for the City of Savannah and the County of Chatham to strike (doc. # 163), and for summary judgment (doc. # 101), are ***GRANTED***. Plaintiff's Amended Complaint (doc. # 47) is ***DISMISSED WITH PREJUDICE***.

This __24__ day of March, 2008.


_____
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA